IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **THE COLOMBIAN CHRISTIAN MISSION**<br>6 Heritage Lane, P.O. Box 95<br>Rittman, OH 44270,<br><br>and<br><br>**DALE R. MEADE**<br>6 Heritage Lane, P.O. Box 95<br>Rittman, OH 44270,<br><br>       Plaintiffs,<br><br>   v.<br><br>**SUSAN R. MORRIS**<br>49 Nells Hill Road<br>Liberty, ME  04949<br><br>and<br><br>**BRIAN A. MORRIS**<br>49 Nells Hill Road<br>Liberty, ME  04949<br><br>and<br><br>**NELL'S HILL HOLDINGS, LLC**<br>c/o Brian A. Morris<br>49 Nells Hill Road<br>Liberty, ME  04949<br><br>and<br><br>**WENDY M. STOLLER**<br>12225 Fulton Road<br>Marshallville, OH  44645 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____<br><br>Judge _____<br><br><br>**<u>COMPLAINT</u>**<br><br><br>**(Jury Demand Endorsed Hereon)** |

|   |   |
|---|---|
| and | ) |
|   | ) |
|   | ) |
| **MARTY J. STOLLER** | ) |
| 12225 Fulton Road | ) |
| Marshallville, OH  44645 | ) |
|   | ) |
| and | ) |
|   | ) |
| **JOHN DOES 1-99**, | ) |
|   | ) |
| Defendants. | ) |

Plaintiffs, The Colombian Christian Mission and Dale R. Meade, by and through undersigned counsel, hereby submits their Complaint against Defendants Susan R. Morris, Brian A. Morris, Nell's Hill Holdings, LLC, Wendy M. Stoller, Marty J. Stoller and John Does 1-99 (collectively, "Defendants") as follows:

## JURISDICTION AND PARTIES

1.      Plaintiff The Colombian Christian Mission ("CCM") is a non-profit corporation organized under the laws of the State of Ohio, originally located in Fayette County, Ohio but now located in Wayne County, Ohio.

2.      Plaintiff Dale R. Meade ("Dale") is an individual and missionary who maintains his U.S. residence in Rittman, Wayne County, Ohio. Meade is the father of Defendants Susan R. Morris and Wendy M. Stoller.

3.      Defendants Susan R. Morris ("Susan") and Brian Morris ("Brian") (collectively, the "Morris Defendants") are married individuals who have resided in Liberty, Waldo County, Maine since July 2012. During the events described herein prior to July 2012, the Morris Defendants lived in Malvern, Carroll County, Ohio.

4.      Defendant Nell's Hill Holdings, LLC ("Nell's Hill") is a Maine limited liability company with its principal office located at 49 Nells Hill Rd., Liberty, Maine 04949. The Morris

2

Defendants are each members, officers and/or managers of Nell's Hill and operate Nell's Hill out of their home.

5.      Defendants Wendy M. Stoller ("Wendy") and Marty J. Stoller ("Marty") (collectively, the "Stoller Defendants") are married individuals currently residing in Marshallville, Wayne County, Ohio.

6.      Defendants John Does 1-99 are currently unidentified individuals and/or entities that participated in the unlawful acts described herein.

7.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims predicated on federal law violations arising from misappropriation or theft of funds through use of the mails and wires and through interstate commerce.

8.      This Court has supplemental jurisdiction over the related Ohio law claims under 28 U.S.C. § 1367.

9.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District and/or because several parties reside or are located here.

10.     Personal jurisdiction exists over Defendants because they reside in, transact business in, committed tortious acts in or causing injury in, and/or directed conduct toward Ohio.

## GENERAL ALLEGATIONS

11.     CCM was organized as a non-profit corporation in 1972 to support Dale's work as a missionary to the South American county of Colombia.

12.     CCM's primary funding for its mission work came from fundraising efforts with churches and individuals.

13.     Dale and his late wife, Jean, ran CCM from 1972-2001. Dale's focus was on CCM's mission-work in Colombia and fundraising. Jean's focus was on CCM's administrative operations, finances and fundraising.

14.     Beginning in 1999, Jean trained their daughter Susan to take over CCM's administrative operations and finances.

15.     On or about November 15, 2001, Susan took control of CCM's administrative operations and finances and became its statutory agent, an authorized signor on CCM's bank accounts, and its Secretary and Treasurer. Jean continued to be involved with fundraising and remained an officer of CCM until her untimely death on May 19, 2017. Dale continued to focus on CCM's mission-work and fundraising as President of CCM.

16.     Susan was paid a salary for her work for CCM. She also handled her parents' personal finances.

17.     On or about June 26, 2012, the Morris Defendants jointly purchased a residence in Liberty, Maine, took out a $239,200 mortgage with Camden National Bank and moved to Maine.

18.     Upon the Morris Defendants' move to Maine, they caused CCM to open a bank account for CCM at Camden National Bank and took possession of CCM's books and records.

19.     Thereafter, the Morris Defendants ran CCM's administrative and financial operations and website from their home in Maine. Donation checks received at CCM's Ohio post office box would be picked up by the Stoller Defendants and mailed to the Morris Defendants.

20.     On or about January 17, 2019, the Morris Defendants paid off their $239,200 residential mortgage to Camden National Bank. Upon information and belief, the Morris Defendants unlawfully used CCM funds to pay off this mortgage.

21.     On or about January 31, 2019, the Morris Defendants formed Nell's Hill Holdings, LLC.

22.     On or about April 23, 2019, the Town of Washington, Maine Planning Board approved Nell's Hill's application to construct a 6,000 square foot commercial storage building with proposed retail sales.

23.     On or about May 21, 2019, the Morris Defendants purchased real property located at 28 and 32 Augusta Rd., Washington, Knox County, ME 04574 ("Commercial Property") to construct the 6,000 square foot commercial storage building with proposed retail sales. Upon information and belief, the Morris Defendants unlawfully used CCM funds to purchase the Commercial Property.

24.     On or about June 6, 2019, the Morris Defendants obtained a $479,000.00 loan for Nell's Hill from Camden National Bank for use in constructing commercial storage building with proposed retail sales.

25.     On or about June 6, 2019, the Morris Defendants re-mortgaged their residential property and mortgaged the Commercial Property to Camden National Bank for $479,000. The Morris Defendants additionally executed an Assignment of Rents in favor of Camden National Bank related to the Commercial Property.

26.     The Morris Defendants constructed commercial storage building, which is now home to The Jojoba Company ("Jojoba"). Defendant Brian Morris is the President of Jojoba, which sells massage oil.

27.     In 2022, Dale informed the Morris and Stoller Defendants that he was considering getting remarried. This was unwelcome news for the Morris and Stoller Defendants, who began

pressuring Dale to retire and cede complete control of CCM to the Morris and Stoller Defendants.

28.     Uncertain about the Morris and Stoller Defendants' resistance to him marrying again, Dale asked Susan to provide him with CCM's financial and accounting information.

29.     Dale made repeated requests to Susan for CCM's financial and accounting information, but Susan deflected these requests and did not provide the information to Dale.

30.     Unknown to Dale at the time and upon information and belief, sometime in late 2022, Susan had begun communicating with John Mulpas, senior minister at Orville Christian Church ("OCC") and one of CCM's largest supporters, and falsely accusing CCM and Dale of financial improprieties.

31.     In December 2022, Susan informed OCC she was resigning from her positions at CCM.

32.     As of January 1, 2023, OCC terminated its support, financially and otherwise, of CCM and Dale due to "concerns of proper corporate oversight and financial accountability" raised by Susan.

33.     As CCM's accountants would later discover, on January 3, 2023, Susan caused a cashier's check to be drawn from CCM's Camden National Bank account for $132,350 and paid to the order of OCC.

34.     Upon the loss of OCC's support for CCM, on January 9, 2023, Dale re-confirmed the support of another large supporter, Palmyra Church of Christ, for CCM and Dale.

35.     On January 12, 2023, Susan reached out to CCM's accountants to inform them that Dale would be taking over the management of his own personal finances moving forward.

36.     On January 25, 2023, OCC sent Palmyra Church of Christ an unsolicited letter stating that it had terminated its support of CCM and Dale "due to concerns of proper corporate oversight and financial accountability" raised by Susan.

37.     On February 28, 2023, Palmyra Church of Christ sent CCM and Dale a letter to inform them that it was discontinuing its support, financial and otherwise, of CCM.

38.     Despite her apparent resignation and active interference with CCM's business relationships, Susan continued to pay herself a salary of more than $4,200 a month through January and February 2023 and used CCM's confidential donor list to write a letter, dated on March 2, 2023, to every CCM donor and inform them of CCM's and Dale's loss of the support of OCC and Palmyra Church of Christ and her resignation as CCM's "Forwarding Agent."

39.     As a direct and proximate result of Susan's letter and the additional actions of the Morris and Stoller Defendants and John Doe Defendants, CCM and Dale lost the support of many of the donors they had built relationships with since 1972.

40.     As a direct and proximate result of the actions of the Morris and Stoller Defendants and John Doe Defendants, in May of 2023, Kentucky Christian University ("KCU") abruptly notified Dale that it would no longer employ him as an adjunct professor, was terminating his contract, and removed him from his assigned Fall 2023 classes.  Dale had enjoyed a long relationship with KCU, having been an adjunct professor for KCU for over 30 years and had taught three classes every semester for the prior 12 years.

41.     On April 8, 2023, Susan notified CCM's accountants that she no longer worked for CCM, raised concerns about CCM's and Dales' personal taxes, which she had been managing, and warned the accountants about continuing to work with CCM and Dale.

42.     On June 26, 2023, the accountants requested copies of CCM's books and financial records from the Morris Defendants, including CCM's bank statements, payroll records and anything else relevant to CCM's operations that may be in their possession.

43.     On or about June 29, 2023, the Morris Defendants took out a second mortgage on their Liberty Maine residence in exchange for a $150,000 home equity loan from Camden National Bank.

44.     On July 17, 2023, the accountants repeated their request for copies of CCM's books and financial records from the Morris Defendants, including CCM's accounting records, corporate records, bank statements, computer files, ownership deeds, and other books and records relevant to CCM's operations that may be in their possession

45.     On August 15, 2023, the accountants again request copies of CCM's books and records from the Morris Defendants, informing them that Dale had given them permission to receive this information and Susan was no longer entitled to hold the information following her December 2022 resignation.

46.     On September 1, 2023, the accountants again requested copies of CCM's books and financial records from Susan and informed her that they were authorized to reimburse her up to $400.00 for her time and expense in gathering and returning the records.

47.     Sometime after September 1, 2023, the Morris Defendants shipped a portion of CCM's records to Indian Run Christian Church, who was acting as an advisory board for CCM, rather than directly to the accountants.

48.     On January 4, 2024, after review of the records sent to Indian Run Christian Church and having received additional records from Camden National Bank, the accountants wrote to Susan and identified several accounting, payroll and fundraising irregularities that

appeared to be tied to her and Wendy's involvement in CCM and a Christian School in Colombia known as Colegio Peniel. Of note, was Susan and Wendy's disclosure of CCM's donor list to Colegio Peniel and the Morris and Stoller Defendants' use of CCM's donor list to solicit donations for Colegio Peniel instead of CCM. Also of note, was the discovery of the January 3, 2023 cashier's check Susan wrote to OCC. As a result, the accountants appealed to Susan to turn over accounting software data files, CCM's donor mailing list, digital photos and Facebook account login and password information.

49.     On January 16, 2024, Brian Morris responded to the accountants' January 4 letter and produced a USB drive containing CCM's accounting software data files.

50.     After review of the USB drive produced by the Morris Defendants, on May 8, 2024, the accountants wrote to the Morris and Stoller Defendants voicing new concerns that CCH's accounting platform was not used as intended and was missing the underlying detail or substance one would need to audit CCM's financial records and accusing the Morris and Stoller Defendants of playing "Army Games," in that they appear to be responding to the accountants' inquiries in form, but not in substance. The accountants also informed the Morris and Stoller Defendants that their actions show signs of impropriety and malfeasance.

51.     Since January 2024, the following additional improprieties were uncovered:

    a.  Susan had been paying herself a salary of nearly twice the amount of Dale and without Dale's authorization as President of CCM;

    b.  Susan had been depositing nearly three times more money into her retirement account than she had been depositing in Dale's retirement account;

    c.  The Morris and Stoller Defendants were redirecting CCM donor funds contrary to donor intents;

    d.   The Morris and Stoller Defendants, had taken approximately $13,000 in CCM donor checks from CCM's post office box and provided them to Palmyra Church of Christ;

    e.   The Morris and Stoller Defendants sent more than $200,000 in CCM funds to individuals in Colombia who were not performing mission work for CCM; and

    f.   The Morris and Stoller Defendants were using CCM's donor list to raise money for their own personal gain and the personal gain of the John Doe Defendants.

## COUNT I
### *Civil RICO (18 U.S.C. § 1962(c))*

52.    Plaintiff realleges and incorporates each allegation of this Complaint as though fully rewritten herein.

53.    At all relevant times, Defendants constituted an association-in-fact enterprise (the "Enterprise") comprised of the Morris Defendants, the Stoller Defendants, Nell's Hill, John Does 1–99, and others, which operated through ongoing coordination to control CCM's finances and records, divert donations and assets, and channel CCM funds to personal and affiliated uses, including paying off the Morris residence mortgage, acquiring and financing the Commercial Property and operations of Nell's Hill and Jojoba, diverting donor checks, and reallocating donor funds.

54.    The Enterprise had a common purpose to obtain and control CCM funds and donor relationships for Defendants' benefit, with relationships among members and sufficient longevity to pursue that purpose, as evidenced by sustained coordination from at least 2012 through 2024 in financial operations, movement of funds, and diversion of donations and assets.

55. Defendants each conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity affecting interstate commerce, including multiple related acts of financial fraud and embezzlement from CCM's bank accounts, diversion of mailed donor checks, and transmission of funds and records between Ohio and Maine, all in furtherance of the Enterprise.

56. The pattern of racketeering activity included at least two acts within ten years, including: (a) drawing a $132,350 cashier's check from CCM's Camden National Bank account payable to OCC on January 3, 2023; (b) diverting approximately $13,000 in donor checks from CCM's post office box; (c) redirecting donor funds contrary to donor intent; and (d) transferring more than $200,000 in CCM funds to non-CCM individuals in Colombia, all as part of an ongoing scheme.

57. Defendants used the mails and financial institutions to facilitate the scheme, including receipt and redirection of donation checks mailed to CCM's Ohio post office box and banking transactions at Camden National Bank in Maine.

58. As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs suffered injury to business and property, including loss of donations, diversion of funds, depletion of CCM accounts, loss of donor relationships, and costs to investigate and remediate the misconduct.

59. Plaintiffs seek all remedies available under 18 U.S.C. § 1964, et seq., including treble damages, costs, and reasonable attorneys' fees.

**COUNT II**
*Theft of Trade Secrets (18 U.S.C. § 1832)*

60. Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

11

61.     CCM's donor mailing list, accounting software data files, digital photos, and social media login credentials constitute confidential and proprietary business information that derives independent economic value from not being generally known and was subject to reasonable efforts to maintain secrecy, including centralized handling through CCM, restricted control by its officers, and use for CCM fundraising and operations.

62.     Defendants knowingly and without authorization stole, appropriated, took by deception, and/or obtained by fraud CCM's donor list and other proprietary data, and used that information to solicit funds for entities and purposes other than CCM, including Colegio Peniel and Defendants' own purposes, thereby converting CCM's donor relationships and goodwill.

63.     Defendants further used and transmitted CCM's proprietary information in interstate commerce, including sending mass donor communications using CCM's donor list and diverting mailed donor checks, with the intent to convert such information for their own economic benefit and to the detriment of CCM.

64.     As a direct and proximate result, Plaintiffs suffered damages including loss of assets, property, donations, donor relationships, and other business expectancy, and incurred costs to recover and secure CCM's data and accounts.

65.     Plaintiffs seek appropriate relief under federal law, including damages and other remedies available for theft of trade secrets.

**COUNT III**
*Misappropriation of Trade Secrets – Ohio Rev. Code Ann. § 1333.61(B)*

66.     Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

67.     Defendants misappropriated CCM's confidential donor lists and used them for their own benefit and that of third parties, including for personal gain, for the benefit of Colegio Peniel, and for the benefit of John Doe Defendants, contrary to donor intent and CCM's interests.

68.     Defendants' acts constitute the misappropriation of trade secrets in violation of Ohio Rev. Code Ann. § 1333.61(B).

69.     As a direct and proximate result, Plaintiffs suffered damages including loss of assets, property, donations, donor relationships, and other business expectancy, and incurred costs to recover and secure CCM's data and accounts.

70.     Plaintiffs seek appropriate relief under Ohio Rev. Code Ann. § 1333.61, et seq., including damages and other remedies available for misappropriation of trade secrets.

**COUNT IV**
*Violation of Corporate Records and Duty Statutes – Ohio Rev. Code Ann. § 1702.30(B) and (E)*

71.     Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

72.     Susan, as an officer and/or director of CCM, failed to make available or deliver CCM's books, records, donor lists, accounting files, payroll records, bank statements, and other company information to Dale and authorized company representatives, despite repeated requests.

73.     Further, Susan continued to pay herself a salary and control financial information contrary to her resignation and in violation of the requirements imposed on officers and agents of a nonprofit corporation to turn over corporate records and discharge duties in good faith and in the best interest of the corporation under Ohio Rev. Code Ann. § 1702.30(B) and (E).

74.     As a direct and proximate result, Plaintiffs suffered damages including loss of assets, property, donations, donor relationships, and other business expectancy, and incurred costs to recover and secure CCM's data and accounts.

**COUNT V**
*Breach of Fiduciary Duty*

75.     Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

76.     As CCM officers, employees, agents, and fiduciaries, Susan and Wendy owed duties of loyalty, care, and obedience to CCM, and breached those duties by self-dealing, misappropriating funds, concealing records, and undermining CCM's donor relationships.

77.     As a direct and proximate result, Plaintiffs suffered damages including loss of assets, property, donations, donor relationships, and other business expectancy, and incurred costs to recover and secure CCM's data and accounts.

**COUNT VI**
*Conversion*

78.     Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

79.     Defendants wrongfully exercised dominion and control over CCM funds and property, including banked funds, donor checks, accounting files, donor lists, and other records, to the exclusion of Plaintiffs' rights.

80.     As a direct and proximate result of Defendants' retention and conversion of CCM funds and property, CCM has been damaged in an amount to be determined at trial.

**COUNT VII**
*Unjust Enrichment*

81.     Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

82.     Defendants knowingly received, benefitted from and were enriched by the receipt and use of CCM funds and assets, including salaries, retirement contributions, loan/mortgage

payoffs, property acquisition and development, and donor funds, under circumstances that make it unjust to retain the benefit without restitution.

83.     As a direct and proximate result of Defendants' unjust retention of CCM funds and property, CCM has been damaged in an amount to be determined at trial.

## COUNT VIII
### *Tortious Interference with Business Relationships*

84.     Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

85.     Defendants intentionally, maliciously and without privilege interfered with CCM's and Dale's relationships and expectancies with OCC, Palmyra Church of Christ, and other donors, causing terminations and losses of support.

86.     As a direct and proximate result of Defendants' tortious interference, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT IX
### *Civil Conspiracy*

87.     Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

88.     Defendants maliciously combined and agreed to commit unlawful acts, including misappropriation, conversion, breach of fiduciary duty, and interference, and committed overt acts causing damages to Plaintiffs.

89.     As a direct and proximate result of Defendants' tortious interference, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT X**
(*Accounting*)

90.     Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

91.     A full and accurate accounting is necessary from the Morris Defendants because they controlled CCM's financial records and accounts, failed to provide complete records, and material gaps and irregularities exist.

**COUNT XI**
*Civil Recovery for Theft or Destruction of Property – Ohio Rev. Code Ann. § 2307.61(A)*

92.     Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

93.     Defendants, without authorization, used and transferred CCM donor funds and assets for their own use, including but not limited to paying off the Morris Defendants' personal mortgage, purchasing commercial property, depositing funds into personal retirement accounts at disproportionate rates, redirecting donor checks, and sending large sums to individuals not performing mission work for CCM.

94.     Defendants also withheld, delayed, or provided incomplete corporate records and information despite repeated demands for return, thereby depriving Plaintiffs of possession and full use of such property.

95.     As a direct and proximate result, Plaintiffs suffered damages including loss of assets, property, donations, donor relationships, and other business expectancy, and incurred costs to recover and secure CCM's data and accounts.

96.     Plaintiffs are entitled to civil remedies, including treble damages, actual damages, attorney's fees, and costs, as provided under Ohio Rev. Code Ann. § 2307.61(A).

**COUNT XII**
*Civil Action for Criminal Acts – Ohio Rev. Code Ann. § 2307.60(A)*

97.     Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

98.     Defendants' conduct, as described above, constitutes acts that would be violations of criminal law, including theft, unauthorized use of property, forgery, conversion, and other unlawful acts with respect to CCM's property and records.

99.     As a direct and proximate result, Plaintiffs suffered damages including loss of assets, property, donations, donor relationships, and other business expectancy, and incurred costs to recover and secure CCM's data and accounts.

100.    Plaintiffs are entitled to relief, including damages, for harm caused by these criminal acts, pursuant to Ohio Rev. Code Ann. § 2307.60(A).

**COUNT XIII**
*Tortious Interference with Contract/Employment Relationship*

101.    Plaintiffs reallege and incorporate each allegation of this Complaint as though fully rewritten herein.

102.    Defendants intentionally and without privilege interfered with Dale's contractual, employment and business relationship with Kentucky Christian University, causing KCU to end its over 30-year relationship with Dale as an adjunct/assistant professor and terminated his contract as the Assistant Professor of Missions/Intercultural Studies.

103.    Defendants were aware of Dale's contractual, employment and business relationship with KCU and interfered with this relationship by making false statements about Dale.

104.    As a direct and proximate result of Defendants' tortious interference, Dale has been damaged in an amount to be determined at trial.

17

**WHEREFORE**, Plaintiffs respectfully request judgment against Defendants, jointly and severally, awarding actual damages, treble damages where permitted by statute, punitive damages, attorney's fees, costs, injunctive relief prohibiting further use or disclosure of CCM's donor lists and trade secrets, ordering the return of all CCM property, and such other relief as this Court deems just and proper.

Dated: November 29, 2025

/s/ Adam D. Fuller
ADAM D. FULLER (#0076431)
adfuller@bmdllc.com
**BRENNAN, MANNA & DIAMOND, LLC**
75 East Market Street
Akron, OH 44308
(330) 374-6737 (Telephone)
(330) 374-6821 (Facsimile)
*Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for any and all issues triable of right by a jury.

/s/ Adam D. Fuller
Adam D. Fuller
*Attorney for Plaintiffs*

4908-1464-9437, v. 1